## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:

Black Iphone Model A1387 and with FCC ID:
BCG-E2430A

Mag. No. 16-MJ-10

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH

I, Peter Kaupp, Special Agent with the Federal Bureau of Investigation (FBI), Northern

Virginia Resident Agency of the Washington Field Office (WFO), Washington D.C., (hereinafter

the "affiant") being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for the

authorization of the examination and extraction of electronically stored information contained in

a cellular telephone.  The electronic device (hereinafter **Target Device**) to be searched is

described further in the following paragraphs and Attachment A.

2. I am a Special Agent of the FBI assigned to the Northern Virginia Resident Agency of

the Washington Field Office.  I have been a Special Agent with the FBI since March 2005.  I am

an "investigative or law enforcement officer" of the United States within the meaning of Title 18,

United States Code, Section 2510(7).  As a federal agent, I am authorized to investigate

violations of laws of the United States and to execute warrants issued under the authority of the

United States.  I am currently assigned to investigations relating to, among other things, crimes

against children, including the production, distribution, and receipt of child pornography, in

violation of 18 U.S.C. Sections 2251, 2252, and 2252A.  I have gained expertise in the conduct

of such investigations through formal training and on-the-job training with more experienced

1

agents. I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, and a variety of other investigative tools available to law enforcement officers. In addition, I have received specialized training in the sexual exploitation of children and have participated in numerous interviews and debriefings of persons involved in the sexual exploitation of children. I have conducted and participated in numerous investigations related to the sexual exploitation of children which have resulted in the arrest and conviction of individuals. In my law enforcement capacity, I have observed and reviewed numerous examples of child pornography, as defined in Title 18 U.S.C. § 2256 in all forms of media.

## BASIS FOR FACTS CONTAINED IN THE AFFIDAVIT

3. Throughout this investigation, law enforcement officers and agents have worked together to collect and record information about the illegal activities of those under investigation. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from state and federal law enforcement officers, and information provided by a cooperating witness.

4. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me, other law enforcement officers, or known to the government. Not every fact known to this investigation or by the government is set forth in this affidavit. Additionally, unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, that statement is described in substance, and in part, and is not intended to be a verbatim recitation of the entire statement.

## IDENTIFICATION OF THE TARGET DEVICE TO BE EXAMINED

5.   This affidavit is respectfully submitted in support of a search warrant for a black Iphone with Model #A1387 and FCC ID: BCG-E2430A, belonging to Scott Cubbage ("CUBBAGE"), which was retrieved from CUBBAGE at the time of his arrest in Washington D.C. on January 5, 2016.

## RELEVANT STATUTES

6.   This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors.

a.   Title 18, United States Code, Section 2252(a)(2) prohibits the knowing receipt or distribution of any visual depiction of minors engaging in sexually explicit conduct that has been mailed or shipped or transported in interstate or foreign commerce.

b.   Title 18, United States Code, Section 2252(a)(4) prohibits the possession of one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce or that were produced using materials that had traveled in interstate or foreign commerce.

c.   Title 18, United States Code, Section 2252A(a)(2) prohibits the knowing receipt or distribution of any child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

d.   Title 18, United States Code, Section 2252A(a)(5)(B) prohibits the knowing possession of any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by

3

any means, including by computer.

## RELEVANT DEFINITIONS

7. The following definitions apply to this Affidavit:

a.  IP Address: The Internet Protocol address (or simply "IP") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer (including smart phone cellular devices) that are attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.  The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.  "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any adversary that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the

4

ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

      d.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

      e.     "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

      f.     "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

      g.     "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

      h.     "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

i.     "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account.  By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

j.     "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

k.     "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

l.     "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

## FACTS ESTABLISHING PROBABLE CAUSE

8.  The **Target Device** is currently in the lawful possession of the FBI.  The item came
into the FBI's possession following the initiation of a criminal investigation involving
CUBBAGE's text communications with your affiant.  The **Target Device** is currently in storage
in the Evidence Control Room at the FBI office in Washington, D.C., a location within the
District of Columbia.  In my training and experience, I know that the **Target Device** has been
stored in a manner in which its contents are, to the extent material to this investigation, in
substantially the same state as they were when the **Target Device** first came into the possession
of the FBI.  For the reasons set forth below, I respectfully submit there is probable cause to
believe that evidence of the distribution and possession of child pornography will be located on
the **Target Device**.

9.  In December 2015, your affiant, in an undercover capacity, posted an online
advertisement in a predicated area of the online website for classified advertisements, which,
based on your affiant's experience and information gathered from other sources, is an area of the
website that is frequented by individuals who have a sexual interest in children and incest. The
advertisement was intended to attract individuals with a sexual interest in children through the
use of adjectives such as "taboo." On December 16, 2015, an individual, later identified as
CUBBAGE, answered your affiant's advertisement, stating "Hey what's up I am into 'taboo,'
I'm 34 white guy my KIK is L3lazin."

10. On December 17, 2015, your affiant contacted CUBBAGE over KIK, which is a free
texting application for mobile devices.  Your affiant asked CUBBAGE what he was "into," and
CUBBAGE replied that he "[l]ikes forced dog incest young bi3 ways rly just about it all." Your
affiant inquired if CUBBAGE likes boys or girls, and CUBBAGE replied: "Both but girls
more…[ages] 5 and up."  Your affiant asked CUBBAGE if he had any "pics" that CUBBAGE

could send and CUBBAGE immediately dropboxed your affiant a link to a video of an unclothed pre-pubescent girl who was masturbating on a couch. The girl appeared to be approximately 12-14 years old, although CUBBAGE indicated that he believed her to be 10 years old. Note that dropbox is a file hosting service that allows users to create a special folder on their computers, which dropbox then synchronizes so that it appears to be the same folder with the same contents. Files placed in this folder are accessible via the dropbox link.

11. As the conversation continued, your affiant told CUBBAGE that he was divorced with a 10-year-old daughter. CUBBAGE replied, "lucky you," and then asked, "you play with her?" Your affiant replied "yes," and CUBBAGE then asked if he could "see her or is that asking to much." In response, your affiant sent CUBBAGE an image of your affiant's purported 10-year-old daughter (note that the image was not of a real child). CUBBAGE immediately replied: "O yes she is very hot…That body is rly hot…I'd blow you to cum on her." Your affiant told CUBBAGE that would be "cool" and "maybe we can meet up and talk before I introduce her."

12. CUBBAGE subsequently stated that if he got more links to child pornography videos that he would send them to your affiant. CUBBAGE stated that he gets these videos and images "off omegle I just use the topic str or dropbox." Note that omegle is a free online chat website that allows users to socialize with others.

13. The conversation continued into the weekend, and on December 20, 2015, CUBBAGE sent your affiant another dropbox link to over 50 videos that contained child pornography. For example, one of these videos depicted a naked, pre-pubescent girl who appeared to be approximately 6 years old, performing oral sex on an adult male. The child vomited during oral sex but the adult male then forced her to continue to perform oral sex on him. In another video, a pre-pubescent girl was having sexual intercourse with a pre-pubescent

8

boy while the pre-pubescent girl was also performing oral sex on an adult male.  In connection with CUBBAGE sending these videos, CUBBAGE stated: "That shit is so hot I got it and was like whoa I gotta show you this one I've jerked off all weekend to it lol."

14. On December 30, 2015, CUBBAGE told your affiant that he has off from work on Sunday and could take a trip to Washington D.C. to meet your affiant and your affiant's purported 10-year-old daughter.  However, your affiant told him that Sunday would not work because your affiant did not have the daughter that night.  CUBBAGE texted that your affiant should just give him a "day or two advance notice" so he could take off from work.  Your affiant then suggested the following Tuesday or Wednesday, and CUBBAGE stated that he had off from work Tuesday night so that would work for him.  CUBBAGE commented, "I'm getting hard just thinking about her little body…I better stop lol walking around with hard on at work isint cool."

15. Your affiant and CUBBAGE continued to about CUBBAGE traveling to Washington D.C. to engage in sexual acts with your affiant's purported 10-year-old daughter.

16. On January 5, 2016, at approximately 5:20 pm, CUBBAGE confirmed that he had left work, was about to take a shower, and then would be on his way to Washington D.C.  At approximately 8:30pm, CUBBAGE texted that he was at the meet location, and shortly thereafter, CUBBAGE was placed under arrest by members of the Child Exploitation Task Force.

17. During a search incident to CUBBAGE's arrest, the defendant was found to be in possession of a black Iphone (the **Target Device**).

18. An administrative subpoena to KIK for username L3lazin provided law enforcement with an email address of isurlocal@yahoo.com and IP login 108.16.146.175.  This IP login was regularly used to access the target KIK account and came back to Bryan's Bowling Center located in Laurel, Delaware.

9

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19. Based on my training and experience, as well as my discussions with others involved in child pornography investigations, advances in electronic technology has revolutionized the way in which child pornography is produced, distributed, received, and possessed.  Individuals who have a sexual interest in child or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer, cellular phone, or flash drive.  These collections are often maintained for several years and are kept close by, usually at the collector's residence.  Individuals with a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

20. Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's

operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

21. Records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in Attachment B, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.

This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

22. Forensic evidence on a cellular phone can also indicate who has used or controlled the cellular phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the cellular phone at a relevant time.

23. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage media, like cellular phones, that are necessary to draw an accurate conclusion, is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

24. I know that when an individual uses a digital device to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica, the individual's device will generally serve both as

12

an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

25. ***Methods To Be Used To Search Digital Devices.*** Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

      a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional
modification or destruction.  Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the integrity of digital data and to
recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery
of "residue" of electronic files from electronic storage media also requires specialized
tools and often substantial time.  As a result, a controlled environment, such as a law
enforcement laboratory or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so
large that it will be extremely impractical to search for data during the physical search of
the premises.  Smart phones capable of storing 64 gigabytes, flash drives capable of
storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes
are now commonplace.  Consequently, just one device might contain enormous amounts
of data.

d.      Further, as discussed above, evidence of how a digital device has been
used, the purposes for which it has been used, and who has used it, may be reflected in
the absence of particular data on a digital device.  For example, to rebut a claim that the
owner of a digital device was not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be necessary to show that
malicious software that allows someone else to control the digital device remotely is not
present on the digital device.  Evidence of the absence of particular data or software on a
digital device is not segregable from the digital device itself.  Analysis of the digital
device as a whole to demonstrate the absence of particular data or software requires

14

specialized tools and a controlled laboratory environment, and can require substantial time.

      e.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f.      Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

g.      Based on all of the foregoing, I respectfully submit that searching the Target Device pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in

advance of the forensic examination of the media or devices.  In light of these difficulties,

your affiant requests permission to use whatever data analysis techniques reasonably

appear to be necessary to locate and retrieve digital information, records, or evidence

within the scope of this warrant.

      h.     In searching for information, records, or evidence, further described in

Attachment B, law enforcement personnel executing this search warrant will employ the

following procedures:

      1.     The analysis of the contents of the Target Device may entail any or

all of various forensic techniques as circumstances warrant.  Such techniques may

include, but shall not be limited to, surveying various file "directories" and the

individual files they contain (analogous to looking at the outside of a file cabinet

for the markings it contains and opening a drawer believed to contain pertinent

files); conducting a file-by-file review by "opening," reviewing, or reading the

images or first few "pages" of such files in order to determine their precise

contents; "scanning" storage areas to discover and possibly recover recently

deleted data; scanning storage areas for deliberately hidden files; and performing

electronic "keyword" searches through all electronic storage areas to determine

whether occurrences of language contained in such storage areas exist that are

related to the subject matter of the investigation.

      2.     In searching the seized Target Device, the forensic examiners may

examine as much of the contents of the electronic storage media or digital devices

as deemed necessary to make a determination as to whether the contents fall

within the items to be seized as set forth in Attachment B.  In addition, the

forensic examiners may search for and attempt to recover "deleted," "hidden," or

17

encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## CONCLUSION

26. Based upon these facts, there is probable cause to believe that there are fruits and evidence of offenses involving violations of Title 18 U.S.C. §§ 2252 and 2252A that will be found within the seized item, as further described in Attachment A and Attachment B.

27. I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

_____
Peter Kaupp
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me
this 11th day of January 2016.


_____
The Honorable Judge Deborah A. Robinson
United States Magistrate Judge